UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE JUANITA Y. JACKSON,

        Debtor.
_____/

JUANITA Y. JACKSON,

        Appellant,                           Case Number 18-13227
v.                                                Honorable David M. Lawson

WENDY TURNER LEWIS, Trustee,

        Appellee.
_____/

## **OPINION AND ORDER AFFIRMING ORDERS OF THE BANKRUPTCY COURT**

Appellant Juanita Y. Jackson was litigating an employment discrimination case, which she had initiated against her former employer in state court, when she filed a Chapter 7 bankruptcy petition. That filing took her state court lawyer by surprise. Nevertheless, he obtained permission from the bankruptcy court to continue that lawsuit on behalf of the bankruptcy trustee and settled the case with the employer. But the settlement amount was considerably lower than Ms. Jackson thought her case was worth. And the relationship between Ms. Jackson and her lawyer had soured by then. After hearing the details, the bankruptcy court approved both the settlement and the lawyer's fee petition. Ms. Jackson now takes issue on appeal with the bankruptcy court's appointment of her state court lawyer to pursue the employment litigation for the trustee and its approval of the settlement. Because neither decision violated the discretion enjoyed by the bankruptcy judge, this Court affirms.

I. Facts and Proceedings

Ms. Jackson is an African-American female who in 2001 began working as a customer service representative at her former employer, DTE Energy Corporate Services, LLC ("DTE") (then Michigan Consolidated Gas). She was fired on July 19, 2016, after serving as a DTE employee for 15 years. This case arises out of the subsequent employment discrimination suit filed in Wayne County, Michigan, circuit court against DTE following Ms. Jackson's termination.

A. The Underlying Litigation

The factual basis for Ms. Jackson's lawsuit is not readily discernible from the designated record. Based on what can be pieced together, it seems that during her time at DTE, Ms. Jackson filed dozens of internal complaints and grievances with government agencies alleging that DTE fostered a discriminatory and hostile work environment. Ms. Jackson alleged that DTE did not pay her overtime, favoring her white supervisor over her in terms of opportunity and types of overtime-generating tasks; that white employees enjoyed leniency when it came to attendance issues; that white employees were not disciplined as strictly as minority employees; and that an African-American, male coworker harassed and threatened her. She also alleged that DTE retaliated against her after she complained to the Equal Employment Opportunity Commission, the Michigan Occupational Safety and Health Administration, the National Labor Relations Board, and internal management about her working conditions.

On February 22, 2016, Ms. Jackson, through retained counsel, filed her original complaint, which she later amended to include claims for retaliation under Michigan's Whistleblowers' Protection Act, Mich. Comp. Laws § 15.362, racial discrimination, hostile work environment, disparate impact, and retaliation under Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.*, and retaliatory harassment and discharge under Michigan's

Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws § 37.1101 *et seq*. Ms. Jackson apparently had rejected a pre-suit offer of $175,000 to leave DTE before she was terminated.

On March 27, 2017, attorney Howard Lederman filed an appearance on behalf of Ms. Jackson following a breakdown in communication between Ms. Jackson and her first attorney. At the time Mr. Lederman joined the case, written discovery had been completed. Mr. Lederman prepared Ms. Jackson for her deposition and took depositions of three witnesses, all of whom were Ms. Jackson's supervisors at DTE. According to Mr. Lederman, he was up against a "tight deadline" to review and digest all the material that had been exchanged and to depose witnesses.

In August 2017, the parties proceeded to case evaluation, a procedure intended to encourage settlements. *See* Mich. Ct. R. 2.402. The panel recommended a settlement of $35,000, which Ms. Jackson rejected. The parties then participated in court-ordered mediation sessions between October 13, 2017, and December 13, 2017. DTE initially offered $35,000; Ms. Jackson's opening position was $175,000. DTE eventually raised its offer to $75,000, but Ms. Jackson refused to settle for anything less than $100,000.

On December 27, 2017, DTE filed a motion for summary disposition. DTE apparently focused on several instances when Ms. Jackson caused workplace accidents and failed to report them to her supervisor, which precipitated her dismissal. Mr. Lederman prepared a response, detailing Ms. Jackson's version of events in a recitation spanning nearly 18 pages and arguing that a factual dispute precluded the relief requested. Mr. Lederman represented Ms. Jackson at oral argument on February 2, 2018, at which time the circuit court ordered the parties to appear for a final settlement conference. The court advised that if the parties did not resolve the case at the

conference, the court would adjudicate the defendant's motion. A trial was scheduled to begin on February 26, 2018.

On February 7, 2018, Mr. Lederman learned for the first time at the settlement conference that on February 2, Ms. Jackson had filed a voluntary bankruptcy petition under Chapter 7 of the Bankruptcy Code. The scheduled settlement conference did not take place, and the case was administratively closed on February 16, 2018, based on the bankruptcy stay.

## B. Bankruptcy Proceedings

Appellee Wendy Turner Lewis was appointed as the Trustee in this matter and subsequently applied to the bankruptcy court for authority to employ special counsel. In her application, the appellee noted that Ms. Jackson had failed to disclose her pending employment discrimination lawsuit at the time of filing her bankruptcy petition. The application indicated that Mr. Lederman had contacted the Trustee on February 14, 2018 informing her that his law firm had been representing Ms. Jackson since the spring of 2017. The appellee stated that Mr. Lederman had agreed to provide services to the Trustee, and that it would be in the best interest of the estate to appoint Mr. Lederman as the Trustee's special counsel at that stage of the lawsuit. The application noted that Mr. Lederman did not possess any interests adverse to that of Ms. Jackson or the estate.

On April 11, 2018, the bankruptcy court, presided over by Judge Mark A. Randon, granted the Trustee's application and authorized the Trustee to employ Mr. Lederman as special counsel. Mr. Lederman was to be paid a contingency fee of one-third of the gross proceeds, plus expenses, subject to the court's approval at a later date.

The next day, Ms. Jackson wrote to Judge Randon objecting to Mr. Lederman's appointment. She complained that she had been denied a fair trial as she had repeatedly sought

and been denied information that would "prove" her case. She also noted that she had learned from the Trustee that Mr. Lederman improperly had informed the Trustee that her lawsuit was close to settling. Ms. Jackson denied that she was prepared to settle the case before the bankruptcy proceedings commenced and requested that Judge Randon allow her a "Court Trial." The letter also made passing reference to the fact that Ms. Jackson had retained attorney Angela Whitaker Payton to represent her through the bankruptcy proceedings.

On June 28, 2018, Ms. Jackson sent another letter to Judge Randon, this time attempting to explain why she believed that her case was worth more than the settlement amounts previously offered. She challenged the appropriateness of the Trustee prosecuting her discrimination lawsuit, asserting that "this is so wrong, for me to be taken off my own Case as my own Witness where I can prove my Case and get money by going to trial." She also requested that she be refunded her bankruptcy filing fee and asserted that it was inappropriate for Judge Randon to allow Mr. Lederman to proceed as special counsel despite Ms. Jackson's issues with his representation.

On July 10, 2018, Judge Randon granted Ms. Jackson a discharge under 11 U.S.C. § 727. The order of discharge explained that it meant that "no one may make any attempt to collect a discharged debt from the debtors personally" and that "[g]enerally, a discharge removes the debtors' personal liability for debts owed before the debtors' bankruptcy case was filed."

On July 12, 2018, Judge Randon addressed Ms. Jackson's April 12, 2018 letter (and an identical one filed on July 5, 2018) in an "Order Regarding Debtor's Letter." The one-page order explained that once Ms. Jackson filed her bankruptcy petition, her lawsuit became the property of the bankruptcy estate. It also instructed Ms. Jackson to contact the Trustee about any concerns regarding Mr. Lederman, denying her request to remove Mr. Lederman to the extent that her letter may be construed as a motion.

On August 14, 2018, the Trustee filed a motion to approve the settlement, authorize the Trustee to sign the release and settlement agreement, and for authority to pay attorney's fees and expenses of special counsel. The motion indicated that the parties to the discrimination lawsuit had participated in a settlement conference on June 14, 2018, and had reached an agreement to settle the employment case for $35,000, subject to the court's approval. The motion noted that $11,950.68 would be deducted from that amount to pay Mr. Lederman's fees and expenses, and $2,500 would be applied to a lien claimed by Ms. Jackson's first attorney. The balance of $20,549.32 would be turned over to the bankruptcy estate. The motion further noted that Mr. Lederman was entitled to fees and expenses incurred in the case under the terms of his retainer agreement with the Trustee.

On August 30, 2018, Ms. Jackson submitted a "Response to the Proposed Settlement Re: Juanita Ms. [sic] Jackson vs. DTE Energy." She explained that she previously had made clear that she would not accept $35,000 or even $75,000 and that she would not settle for less than $175,000 — the amount DTE had offered in exchange for her voluntary resignation. Ms. Jackson maintained that she had ample evidence of white employees receiving better treatment than she and an "abundance of witnesses who could attest to the discrimination, unfair treatment, and harassment" that she suffered. Ms. Jackson repeated her disapproval of Mr. Lederman's appointment as special counsel, emphasizing that Mr. Lederman failed to carry out his duties as her lawyer. The response included a lengthy recitation of "facts" that Ms. Jackson believed supported her case and that Mr. Lederman did not take into account or deliberately ignored in prosecuting her claims. For example, Ms. Jackson asserted that she had proof that DTE improperly challenged her requested medical leave and wrongfully reassigned her to a different location and that she was denied an opportunity

to attend an interview. She also noted that Mr. Lederman mistakenly referred to another client in a filing, underscoring his shoddy handling of Ms. Jackson's case.

On September 17, 2018, the Trustee filed a response to Ms. Jackson's objection. In addition to defending Mr. Lederman's litigation strategy during the course of Ms. Jackson's representation, the Trustee identified several weaknesses in Ms. Jackson's case that counseled in favor of accepting a settlement of $35,000. Citing the applicable standard governing ELCRA claims, the Trustee explained that Ms. Jackson did not have sufficient evidence to establish a *prima facie* case or that DTE's asserted basis for terminating her was pretextual. The Trustee noted that the accused employee responsible for allegedly harassing Ms. Jackson and creating a hostile work environment was an African-American male; that Ms. Jackson's reassignment following an altercation between her husband and the harasser did not rise to the level of a demotion as her duties and pay were unaffected; that Ms. Jackson could not establish retaliation as most of her disciplinary actions preceded her complaints to governmental agencies; and that DTE's progressive discipline system mandated Ms. Jackson's termination as a result of numerous violations of workplace safety policies. The Trustee also explained that Mr. Lederman found no good-faith basis to pursue a claim under the Family and Medical Leave Act (FMLA) based on DTE's prior handling of Ms. Jackson's FMLA requests and that although Ms. Jackson had presented some evidence of white employees receiving better treatment, she could not show that she was similarly situated to these employees. Separately, the Trustee noted that despite Ms. Jackson's belief that the case was not close to settlement at the time she filed for bankruptcy, the parties' positions were not so far apart that settlement was impossible.

Ms. Jackson replied to the Trustee's response, repeating many of her earlier contentions that Mr. Lederman's decisions weakened her case and resulting bargaining position. She stated

that Mr. Lederman poorly chose witnesses to depose and did not review all the materials she provided him that would have strengthened her response to DTE's motion for summary disposition. Ms. Jackson asserted that had Mr. Lederman "interviewed the correct witnesses who had provided [Ms. Jackson] with statements, included [Ms. Jackson's] statements, [her] video and audio tapes than [sic] [her] Case would have proved discrimination beyond a doubt."

On September 24, 2018, the bankruptcy court held a hearing on the Trustee's motion for an order approving the settlement. During the hearing, Judge Randon engaged in a lengthy colloquy with Ms. Jackson, allowing her significant time to object to the settlement amount as unreasonable and indulging her many complaints about Mr. Lederman. The court took particular note of Ms. Jackson's revelation that during a settlement conference, the state trial judge told her that she had a weak case and counseled her to take the $75,000 settlement offer. Ms. Jackson changed lawyers earlier in the case, and she could have asked the judge to let her do that again if she were dissatisfied with Mr. Lederman's representation of her, although she was told that the judge might not allow that. And before the Trustee even entered the picture, Ms. Jackson's employer had made a series of declining offers — from $75,000 to $60,000 to $55,000 — ultimately expressing a strong desire to the trial judge to proceed with its motion for summary disposition, in which it had great confidence.

Ruling from the bench, Judge Randon reminded Ms. Jackson that control of her lawsuit shifted to the Trustee once the bankruptcy petition was filed. And although Ms. Jackson had the chance to settle the case for considerably more money, "sometimes that's what happens when you play a game of chicken and it doesn't wind up in your favor. Once the Trustee takes over, the Trustee gets to make the decision whether it's in the best interest of the estate to settle the case." Judge Randon found that Mr. Lederman had worked up the case adequately and negotiated the

$35,000 settlement in good faith. And he approved the settlement because it was in the best interest of the bankruptcy estate.

The bankruptcy court entered a written order confirming that decision about three weeks later. Ms. Jackson then filed a timely notice of appeal.

II. Discussion

The bankruptcy court's decision to approve a settlement is entitled to a measure of deference, and therefore this Court reviews it for an abuse of discretion. *In re MQVP, Inc.*, 477 F. App'x 310, 312 (6th Cir. 2012) (citing *Lyndon Prop. Ins. Co. v. E. Ky. Univ.*, 200 F. App'x 409, 413 (6th Cir. 2006)). The same goes for the bankruptcy court's retention and compensation orders. *In re Federated Dep't Stores, Inc.*, 44 F.3d 1310, 1315 (6th Cir. 1995) (citing *Calhoun v. Stratton*, 61 F.2d 302, 303 (6th Cir. 1932)). "An abuse of discretion occurs when the [court below] 'relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard.'" *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 640 (6th Cir. 2018) (quoting *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000)).

Ms. Jackson's brief is rambling and difficult to follow, and she cites no authority in support of her appeal. Affording her the generous reading due *pro se* litigants, it appears that her arguments evoke two chief complaints centered on Mr. Lederman's alleged incompetence: (1) it was improper for the bankruptcy court to allow Mr. Lederman to serve as special counsel to the Trustee; and (2) the Trustee made a premature and underinformed decision to settle Ms. Jackson's discrimination case, which the bankruptcy court should not have approved, because her claims were much stronger than what was presented. Both arguments lack merit.

Before discussing the arguments in more detail, it is important to remember that when a debtor files for bankruptcy, "her estate [becomes] the owner of all her property, including tort

claims that accrued before she filed her bankruptcy petition." *Auday v. Wet Seal Retail, Inc.*, 698 F.3d 902, 904 (6th Cir. 2012); *see* 11 U.S.C. § 541(a)(1) (defining the estate as "all legal or equitable interests of the debtor in property" when the debtor files for bankruptcy). The trustee in bankruptcy acts as the representative of the estate, and it is the trustee who "has capacity to sue and be sued." 11 U.S.C. § 323(b). "'It is well settled that the right to pursue causes of action formerly belonging to the debtor — a form of property "under the Bankruptcy Code" — vests in the trustee for the benefit of the estate.'" *Bauer v. Commerce Union Bank, Clarksville, Tenn.*, 859 F.2d 438, 441 (6th Cir. 1988) (quoting *Jefferson v. Mississippi Gulf Coast YMCA*, 73 B.R. 179, 181-82 (S.D. Miss. 1986)).

A. Appointment of Special Counsel

The Bankruptcy Code allows a trustee, with the court's approval, to retain an attorney as special counsel to prosecute an action on behalf of the estate, even if the attorney had represented the debtor pre-petition, as long as it is in the best interest of the estate and the attorney does not have interests adverse to the debtor or to the estate. 11 U.S.C. § 327(e); *see e.g.*, *Auday*, 698 F.3d at 903-904 (observing that the bankruptcy court granted the trustee's application to appoint the debtor's lawyer as special counsel for the trustee to pursue the debtor's age-discrimination claim even where the debtor's lawyer wrote a letter to the bankruptcy trustee after nearly three months after the petition was filed informing the trustee of the "possible age discrimination case" and asking "what do we need to get to be hired?"). The conflict rules are relaxed somewhat, in that special counsel need not be an entirely disinterested person. *DeVlieg-Bullard, Inc. v. Natale (In re DeVlieg)*, 174 B.R. 497, 503 (N.D. Ill. 1994)). Otherwise, contingency fee arrangements would be problematic. *See* 11 U.S.C. § 328 (expressly allowing a trustee to hire professionals "on a contingent fee basis"). Likewise, the prohibition against an adverse interest applies only "to the

matter on which such attorney is to be employed," 11 U.S.C. § 327(e), not to the estate as a whole, a standard applicable in other contexts, *see* 11 U.S.C. § 327(a). *Ibid.*

Ms. Jackson's objections to Mr. Lederman's appointment center not so much on any conflicting interest, but rather she questions his competence in handling the employment case. She says that she voiced her objection to Judge Randon before the hearing and lists the following reasons in support of her position: (1) Mr. Lederman informed the Trustee that Ms. Jackson was ready to accept a settlement offer even though she had not consented to an amount; (2) Mr. Lederman did not present all the relevant evidence in litigating her claims, including facts that would have established that Ms. Jackson was a victim, not a perpetrator, of threats and destructive behavior and that white employees were treated better than her; and (3) Mr. Lederman committed a series of professional blunders, including falling asleep at a deposition, identifying a DTE employee with the wrong job title, failing to request certain information from DTE's counsel and to develop Ms. Jackson's FMLA claim, withholding Ms. Jackson's boxes of evidence from her, and allowing DTE's representatives to attend Ms. Jackson's deposition but not informing her that she had a right to be present during their depositions.

It is far from clear that any of these miscues affected Mr. Lederman's performance on behalf of the bankruptcy estate. But Ms. Jackson's objection to Mr. Lederman's appointment as special counsel is not entirely unreasonable in light of the breakdown of their professional relationship that preceded the bankruptcy proceedings. Even if the bankruptcy court did not know the full extent of Ms. Jackson's and Mr. Lederman's history at the time that it granted the Trustee's application for special counsel, Ms. Jackson's dissatisfaction with Mr. Lederman's representation was evident from her several, subsequent letters to Judge Randon. An argument could be made that the bad blood that had developed between Ms. Jackson and Mr. Lederman impaired Mr.

Lederman's ability to negotiate in good faith, since he likely wanted to resolve the case as quickly as possible.

But there is no actual evidence that Mr. Lederman held an "interest adverse" to Ms. Jackson, especially when considering, as Judge Randon observed on the record, that it also was in Mr. Lederman's best interest to obtain the highest settlement figure possible since that translated to a higher contingency fee award for him. And significantly, no creditors objected to Mr. Lederman's appointment, underscoring the fact that his continued involvement on the case "promote[d] economy in administration." *In re Southern Kitchens, Inc.*, 216 B.R. 819, 826 (D. Minn. 1998) (explaining that section 327(e) "recognizes continuing the retention of pre-petition counsel/creditors will avoid wasteful expense and delay that might result from having to hire disinterested counsel unfamiliar with the subject matter.").

Mr. Lederman was familiar with the case. A new lawyer — which would have been the third plaintiff's lawyer on the case — would have had to expend considerable time and effort to come up to speed. Mr. Lederman agreed to a contingency fee; other counsel, faced with the prospect of honoring past attorneys' *quantum meruit* liens for a share of the fee, may not have agreed to take the case on terms as beneficial to the Trustee. Mr. Lederman also appears to have been familiar with the field of employment law and knew his way around the local court system. There were several reasons, therefore, that favored his appointment. Balancing those against friction that had developed in his relationship with Ms. Jackson required discretion and judgment by the bankruptcy court. That court did not clearly err in determining the facts or misapply the law, and therefore did not abuse its discretion by appointing Mr. Lederman as special counsel.

B. Settlement Approval

Ms. Jackson also believes that the $35,000 settlement should not have been approved because the bankruptcy court did not fairly evaluate the merits of her claims. She notes that DTE initially offered her $175,000 when she filed her lawsuit, which she declined, and that she was charged a fee of $75.00 for each failed mediation session. Ms. Jackson says that she never was informed by Mr. Lederman that filing for bankruptcy would take her lawsuit out of her control. She says that Mr. Lederman settled the case without her authority and otherwise prevented her from achieving a fair outcome.

These arguments ring hollow when the decision to reject all but the last settlement offer rested entirely with Ms. Jackson. What's more, the decision to file for bankruptcy was hers alone, with no input whatsoever from Mr. Lederman. Ms. Jackson's professed shock at learning about losing control of her employment case matched her lawyer's surprise when he discovered the bankruptcy filing. By that time, Mr. Lederman's duty of loyalty was to the bankruptcy estate administered by the Trustee. Because of the foreseeable potential for disagreement with the debtor over the suitability of settlements, the Bankruptcy Code requires court approval. *In re Greektown Holdings*, LLC, 728 F.3d 567, 575 (6th Cir. 2013) (citing Fed. R. Bankr. P. 9019(a)).

The approval process begins with the trustee filing a motion and giving notice. The court then must "apprise itself of all facts necessary to evaluate the settlement and make an informed and independent judgment as to whether the compromise is fair and equitable." *Bard v. Sicherman* (*In re Bard*), 49 F. App'x 528, 530 (6th Cir. 2002)). The factors the court considers when making that judgment are "(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the

creditors and a proper deference to their reasonable views in the premises." *In re Bard*, 49 F. App'x at 530.

When exercising that judgment, the bankruptcy court "enjoys 'significant discretion.'" *In re MQVP*, 477 F. App'x at 312-13 (citing Fed. R. Bankr. P. 9019(a); *In re Rankin*, 438 F. App'x 420, 426 (6th Cir. 2011)). "The very purpose of such a compromise agreement 'is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims.'" *Bard*, 49 F. App'x at 530 ( (quoting *In re A & C Props.*, 784 F.2d 1377, 1380-81 (9th Cir.1986)). Indeed, "the law favors compromise and not litigation for its own sake." *In re MQVP, Inc.*, 477 F. App'x at 312 (citations and quotation marks omitted).

Ms. Jackson has not identified any basis to disturb the bankruptcy court's conclusion that the settlement was fair and in the best interests of the creditors. Admittedly, the court's bench ruling could have (and perhaps should have, when considering the appellant's *pro se* status) more clearly identified the factors to be considered in approving a proposed settlement and explained to Ms. Jackson that the balance of those factors favored approval. *See e.g.*, *In re Boddie*, 569 B.R. 297, 303-310 (S.D. Ohio 2017) (mapping the court's findings onto the four *Bard* factors). Nevertheless, the bankruptcy court did not abuse its discretion by approving the settlement amount.

First, the probability of success, were the Trustee to continue to prosecute the claim on behalf of Ms. Jackson's bankruptcy estate, was low. The parties had reached the summary disposition stage of the proceedings in state court, and DTE apparently had made it clear that it preferred to press ahead with its motion than to continue settlement negotiations. Certainly, DTE could have been posturing in order to intimidate Ms. Jackson into accepting a lower settlement. But Ms. Jackson mentioned to Judge Randon on the record that the circuit court judge had told Ms. Jackson that her case was weak. What's more, Mr. Lederman identified several reasons why

he believed that Ms. Jackson could not establish the *prima facie* elements for an ELCRA claim and that even if she could, there was little chance that Ms. Jackson would be able to show pretext. *See In re Boddie*, 569 B.R. at 304 (explaining there were "several significant hurdles to any substantial recovery" on the debtor's discrimination claim where "even assuming Trustee [was] able to prove a *prima facie* case — there are nondiscriminatory reasons for [the defendant's] actions according to the statements of [its] employees concerning the incident with Debtor.").

Second, Mr. Lederman and the Trustee did not mention any difficulty of collection of any judgment the estate may receive were it to continue to prosecute Ms. Jackson's ELCRA claims. However, "[w]hile it may be true that collectability of any judgment from [DTE] — a large [energy corporation] — is a nonissue, the Court would be remiss if it did not acknowledge that [DTE] has the financial resources to sustain litigation over an extended period of time and may appeal any judgment obtained by Trustee." *Id.* at 308. "Thus, although there is little doubt that any judgment would ultimately be collectible, collection of the judgment could be delayed, if [DTE] elected to pursue its appellate rights." *Ibid.*

Third, the combined complexity, expense, inconvenience, and delay associated with litigation favored approval. Although the law governing ELCRA claims is well-settled, preparing a case of dubious merit for trial would have generated non-negligible expenses for the estate, including calling the damages expert that Ms. Jackson complains Mr. Lederman never hired. *See In re Boddie*, 569 B.R. at 309 ("The expense of hiring experts, along with the other expenses inherent in litigation — including costs for transcribing depositions already taken, costs associated with taking additional depositions, fees for obtaining documents, and witness fees — may make it difficult or impossible for Trustee to continue litigation of the . . . Claim, given the estate's lack of financial resources.).

And fourth, it certainly was in the best interest of the creditors for the Trustee to walk away with some money, rather than nothing at all, when considering the pending motion for summary disposition and the circuit court judge's expressed belief that the case was a loser. Even though Ms. Jackson believes that she was entitled to much more, the amount was not lower than anything previously offered by DTE and was the same amount recommended by the case evaluation panel. The Trustee was empowered to cut Ms. Jackson's losses, and she appropriately discharged her duty to the creditors. *See Bauer*, 859 F.2d at 441 ("Fully litigating a tort claim could easily exhaust assets that would otherwise go to creditors, and in the first instance the person vested with responsibility for deciding whether to settle or fight is the trustee, not the debtor.").

Ms. Jackson insists that her case was worth more than $35,000, pointing to the pre-suit offer made by DTE and to the other serial and diminishing offers made during the mediation sessions. But the settlement value of a case is what a defendant is willing to pay at a particular point in time, and that can be fluid. A plaintiff certainly has the right to take risks in negotiations, but she cannot be heard to complain when she loses that "game of chicken," as Judge Randon aptly observed.

### C. Fees

Ms. Jackson also mentions fees in her brief, although her specific disagreement with the fee award is not spelled out.

The Bankruptcy Rules allow trustees to hire counsel to assist in carrying out their duties and contemplate payment on a contingency fee basis. *In re DeVlieg*, 174 B.R. at 503 (quoting 11 U.S.C. § 328(a)). It is not clear from the appellant's brief that Ms. Jackson disputes the entire award of fees and costs to Mr. Lederman in his role as special counsel or if she instead is principally opposed to paying mediation fees when settlement talks were unsuccessful. If the former, the

Trustee's motion and the order granting it indicate that Mr. Lederman was allocated approximately $11,000 from the settlement proceeds, amounting to approximately one-third of the settlement in accordance with his special counsel contingency fee agreement. Although the record is cloudy on this point, it seems that this amount also covers Mr. Lederman's contingency fee for representing Ms. Jackson before she filed her bankruptcy petition. That percentage is customary and regularly applied in the Michigan state courts. *See*, *e.g.*, Mich. Ct. R. § 8.121(B).

If Ms. Jackson complains about charges for court-ordered case evaluation, Mr. Lederman clarified that she was charged a single $75 fee. She was not charged additional fees for the several settlement conferences that came later.

In all events, the bankruptcy court did not abuse its discretion by approving the fee award to Mr. Lederman.

### III. Conclusion

Ms. Jackson has not identified any error in the bankruptcy court's orders challenged on appeal. Once Ms. Jackson filed her bankruptcy petition, she no longer had a say in the resolution of her employment discrimination case. Nothing in the record suggests that the bankruptcy court abused its discretion by approving the settlement, even though Ms. Jackson believes that the merits of her case warranted a much higher sum. Nor is there any evidence that Mr. Lederman's appointment was improper simply because Ms. Jackson was dissatisfied with his litigation strategy.

Accordingly, it is **ORDERED** that the orders of the bankruptcy court appointing special counsel and approving the settlement are **AFFIRMED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: March 25, 2020

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on March 25, 2020.

                              s/Susan K. Pinkowski
                              SUSAN K. PINKOWSKI